J-S36001-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: H.P., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: H.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 771 WDA 2022 |

Appeal from the Order Entered June 27, 2022
In the Court of Common Pleas of Allegheny County
Orphans' Court at No: CP-02-AP-0000221-2021

BEFORE: STABILE, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY STABILE, J.: **FILED: DECEMBER 14, 2022**

Appellant, H.S. ("Mother"), appeals from the June 27, 2022 order, as amended, in the Court of Common of Pleas of Allegheny County, involuntarily terminating her parental rights to her daughter, H.P. ("Child"), born in April 2020.[1] After careful review, we affirm.

The factual and procedural history relevant to this appeal are as follows. The Allegheny County Office of Children, Youth and Family ("CYF") has been involved with this family since 2002, at which time Mother was a delinquent minor, who admitted to drug and alcohol and mental health issues. N.T.,

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Pursuant to the same order, the orphans' court involuntarily terminated the parental rights of Child's father, R.S. ("Father"). Father did not file a separate appeal, and he is not a participating party to the instant appeal.

4/22/22, at 15. Between 2002 and 2013, Mother had four children, none of whom are currently in her care. *Id.* at 14. During that time, CYF was involved with the family on multiple occasions primarily due to concerns of drug and alcohol use. *Id.* at 16. In June 2015, Mother's parental rights to one of the four children were involuntarily terminated. *Id.* at 14.

In April 2020, CYF received a referral that Child was born nine-and-a-half weeks early, and Mother admitted to relapsing on cocaine due to stress from domestic violence with Father, whom she married in June 2019. *Id.* at 13-14, 17. CYF verified that Mother and Father were in "treatment" and closed its investigation.[2] *Id.* at 17. Child remained in the hospital's neonatal intensive care unit ("NICU") until she was discharged to Mother on May 27, 2020. *Id.* at 18.

On May 26, 2020, CYF received a referral based on a report that Father had physically and sexually abused Mother. *Id.* at 17. As a result, Father was arrested the next day, on May 27, 2020, and was not released until October 26, 2021.[3] *Id.* at 18.

---

[2] It is unclear from the record what particular treatment Mother was engaged in at that time. N.T., 4/22/22, at 17.

[3] Father was convicted of recklessly endangering another person and sentenced to confinement for a minimum of nine months and a maximum of eighteen months at Allegheny County Jail. He was also sentenced to probation for two years. CYF Ex. 5, Order of Sentence, 10/6/21.

On June 23, 2020, the City of Clairton Police Department received a report of a woman "swinging her baby around in a carriage" at a gas station. *Id.* at 6. Officer Jodi Leitzell arrived at the gas station and observed Mother getting out of her vehicle. *Id.* at 5, 7. Mother appeared to be under the influence as she was running in circles, back and forth, and bending over to seemingly pick up items that were not on the ground. *Id.* at 8. Officer Leitzell saw heroin in plain sight in Mother's vehicle, and she saw Child in an unrestrained baby carriage inside the vehicle. *Id.* at 8-9. Mother was arrested and released later that day. *Id.* at 8, 19. The criminal court ordered no contact between Mother and Child, which remained in effect until August 20, 2020.[4] *Id* at 8, 19, 25.

On June 24, 2020, CYF obtained emergency custody of Child and placed her with foster parents, D.H. and C.R. ("Foster Parents"). *Id.* at 20. Child has since remained in the care of Foster Parents. *Id.* at 34.

On July 14, 2020, the court adjudicated Child dependent. CYF Ex. 6, Order of Adjudication, 7/14/20, at 1. The court ordered Mother to participate in domestic violence counseling, comply with random urine drug screens, and

---

[4] Mother was convicted of endangering the welfare of a child ("EWOC"), driving under the influence ("DUI"), and intentional possession of a controlled substance. Under the EWOC count, Mother was sentenced to eighteen months of probation supervised by Allegheny County. Under the DUI count, the trial court sentenced her to six months of probation and time served of ten days. The court further ordered, *inter alia*, a drug and alcohol evaluation, drug screening, and safe driving school. CYF Ex. 4, Order of Sentence, 5/6/21.

continue drug and alcohol treatment. *Id.* at 2-3. The court ordered that once the criminal court's no contact order is lifted, Mother is to have supervised visits with Child. *Id.* at 2.

The court held regular permanency review hearings throughout the dependency case. CYF Ex. 6. On September 8, 2020, the court found aggravated circumstances existed as to Mother because her parental rights were involuntarily terminated with respect to another child. CYF Ex. 6, Aggravated Circumstances Order, 9/8/20. The court ordered that reasonable efforts to reunify Child with Mother were to continue. *Id.*

On August 29, 2020, Mother became incarcerated on charges related to the June 23, 2020 incident.[5] N.T., 4/22/22, at 20. Mother remained in prison until March 31, 2021. *Id.* at 21. During her incarceration, Mother participated in "a few" virtual visits with Child *via* videoconference. *Id.* at 26. Once released from prison, Mother was court-ordered to have supervised visits with Child at the CYF office or as arranged by the caregiver. CYF Ex. 6, Permanency Review Order, 3/18/21.

On October 14, 2021, CYF filed a petition to involuntarily terminate Mother and Father's parental rights to Child. Between December 28, 2021,

_____

[5] From what we can discern from the record, Mother was incarcerated based on the charges of EWOC, DUI, and intentional possession of a controlled substance, stemming from the June 23, 2020 incident. As part of her criminal sentence, Mother received credit for time served at the Allegheny County Jail from August 29, 2020, through September 7, 2020. CYF Ex. 3, Order of Sentence, 5/6/21.

- 4 -

and February 8, 2022, while the petition was pending, Mother was offered one hour of unsupervised visitation per week in addition to her supervised visits with Child. N.T., 4/22/22, at 26, 45. On February 8, 2022, Mother's visits reverted to being fully supervised because she failed to attend her random drug screens. *Id.* at 27. Mother missed eight visits in January and February 2022, and she missed three visits in March and April 2022. *Id.* at 27-28.

The orphans' court conducted a hearing on the petition on April 22, 2022, when Child was two years old. Child was represented by a guardian *ad litem* ("GAL").[6] CYF presented the testimony of: Jodie Leitzell, a police officer with the City of Clairton Police Department; Cassandra Guthrie, CYF caseworker; Patricia Pepe, Ph.D., a licensed psychologist; and Tarraca Jackson, a supervisor with the Allegheny County Health Department's ("Health Department") drug and alcohol screening office. The parties stipulated Dr. Pepe as an expert in child and forensic psychology. Dr. Pepe conducted Mother's psychological evaluation and her interactional evaluation with Child in August 2021, as well as Foster Parents' psychological evaluations and their

_____

[6] Insomuch as Child's legal interests were incapable of ascertainment due to her young age, the court did not appoint separate legal counsel for Child. **See In re T.S.**, 192 A.3d 1080, 1092-93 (Pa. 2018) (holding that "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied).

interactional evaluations with Child in August 2021 and February 2022. Mother testified on her own behalf.

Ms. Guthrie testified that Child underwent "an assessment at the Children's Developmental Center, which recommended that she work with Alliance for Infants." N.T., 4/22/22, at 32. Ms. Guthrie testified that Alliance for Infants recommended developmental and occupational therapy for Child. *Id.* Ms. Guthrie explained that these services are implemented at Child's daycare three times per month, and at Child's foster home once a month. *Id.* at 33.

By order dated April 22, 2022, and entered on June 27, 2022, as amended, the orphans' court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8).[7] On June 28, 2022, Mother timely filed a notice of appeal and a concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). The trial court issued a Rule 1925(a) opinion dated July 26, 2022.

On appeal, Mother presents the following issues for review:

1.  Did the [orphans'] court abuse its discretion and/or err as a matter of law in granting the petition to involuntarily terminate Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), (5), and (8)?

2.  Did the [orphans'] court abuse its discretion and/or err as a matter of law in concluding that CYF met its burden of

---

[7] The court amended the termination order entered on May 31, 2022, to correct a typographical error. Specifically, the court omitted 23 Pa.C.S.A. § 2511(a)(3) and included 23 Pa.C.S.A. § 2511(a)(8).

> proving by clear and convincing evidence that termination of Mother's parental rights would best serve the needs and welfare of the Child pursuant to 23 Pa.C.S.A. § 2511(b)?

Mother's Brief at 8.

We note the well-settled standard of review. "In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence." *In re Adoption of C.M.*, 255 A.3d 343, 358 (Pa. 2021). When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. *Interest of S.K.L.R.*, 256 A.3d 1108, 1123 (Pa. 2021). "Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion." *In re Adoption of L.A.K.*, 265 A.3d 580, 591 (Pa. 2021).

"[A]n abuse of discretion does not result merely because the reviewing court might have reached a different conclusion" or "the facts could support an opposite result." *In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012). Instead, an appellate court may reverse for an abuse of discretion "only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* at 826. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings. *Interest of S.K.L.R.*, 256 A.3d at 1123-24.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental "right to make decisions concerning the care, custody, and control" of his or her child with the "child's essential needs for a parent's care, protection, and support." *C.M.*, 255 A.3d at 358. Termination of parental rights has "significant and permanent consequences for both the parent and child." *L.A.K.*, 265 A.3d at 591. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *C.M.*, 255 A.3d at 359 (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination." *Id.*; *see also* 23 Pa.C.S.A. § 2511(a)(1)-(11). In evaluating whether the petitioner proved grounds under Section 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must assess the petition under Section 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

Instantly, we analyze the orphans' court's involuntary termination order pursuant to Section 2511(a)(2) and (b):[8]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

With regard to termination of parental rights pursuant to Section 2511(a)(2), we have indicated:

---

[8] This Court need only agree with any one subsection of Section 2511(a), in addition to Section 2511(b), in order to affirm the termination of parental rights. *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Therefore, we need not review Mother's argument with respect to Section 2511(a)(5) and (8).

> In order to terminate parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(2), the following three elements must be met (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003) (citation omitted). The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (quoting *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa. Super. 2015) (internal citation omitted)). "Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *Matter of Adoption of M.A.B.*, 166 A.3d 434, 443 (Pa. Super. 2017) (quoting *In re N.A.M.*, 33 A.3d 95, 100 (Pa. Super. 2011)). As such, "[a] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *In re S.C.*, 247 A.3d at 1105 (quoting *In re Z.P.*, 994 A.2d 1108, 1118 (Pa. Super. 2010)).

In *In re Adoption of S.P.*, *supra*, our Supreme Court addressed the relevance of incarceration in termination decisions under Section 2511(a)(2). The *S.P.* Court held that "incarceration is a factor, and indeed can be a determinative factor, in a court's conclusion that grounds for termination exist

- 10 -

under § 2511(a)(2) where the repeated and continued incapacity of a parent due to incarceration has caused the child to be without essential parental care, control or subsistence and that causes of the incapacity cannot or will not be remedied." 47 A.3d at 828.

With respect to Section 2511(b), this Court has stated that the trial court "must . . . discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). Further,

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

*In re A.S.*, 11 A.3d 473, 483 (Pa. Super. 2010). Our Supreme Court explained, "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

We begin with Mother's first issue on appeal wherein she argues there was insufficient evidence to show that Mother had continued incapacity to

provide essential parental care for Child or that the incapacity have not or will not be remedied by Mother. Mother's Brief at 22. Mother asserts that she participated in dual diagnosis treatment, intimate partner violence treatment, random drug screens; completed parenting classes; and attended supervised visitation. *Id.* at 23. Mother further asserts that she is no longer in a relationship with Father. *Id.* at 26. We do not find Mother's argument persuasive.

The record demonstrates that Mother participated in a dual diagnosis treatment at the Mon Yough program from April to October 2021. N.T., 4/22/22, at 93-95, 97. She attended intimate partner violence treatment at the Women's Center and Shelter from May 13 to August 12, 2021, and successfully completed the program. *Id.* at 39. Mother appeared for random drug screens at the Health Department between June 29 through December 10, 2021, except for one "no show" on November 26, 2021. CYF Ex. 3, at 2. Mother also completed the Arsenal Parenting Program. N.T., 4/22/22, at 29.

The orphans' court acknowledged that Mother participated in the above programs. Orphan's Court Opinion at 11-14. The court, however, found that Mother failed to satisfy her mental health, drug and alcohol, and domestic violence goals, and the court noted that it "does not believe that [Mother] possesses the ability to parent the [C]hild safely and effectively." *Id.* at 13. The court explained that "Mother's ability to comply with her goals for approximately six months did not persuade this [c]ourt that she can perform

the actions necessary to assume parental responsibilities." *Id.* at 14. The record supports the orphans' court's finding.

With respect to Mother's mental health, Dr. Pepe performed a psychological evaluation of Mother on August 25, 2021, and diagnosed her with the following: history of substance dependence, specifically crack cocaine and opioid use disorder; persistent depressive disorder; and history of anti-social personality disorder. N.T., 4/22/22, at 55; CYF Ex. 2, Psychological Evaluation Report, 8/19/21 & 8/25/21, at 11. Dr. Pepe explained that a personality disorder involves a "dysfunction with cognition" and a "repetition of dysfunctional behaviors." N.T., 4/22/22, at 57. She noted that the condition is pervasive, "all-encompassing," and "very stagnant or difficult to change." *Id.* Dr. Pepe elaborated that a personality disorder can affect parenting, noting that depending on the type of personality disorder, there is "instability" and "confusion," and "the child does not have the love and stability needed for positive growth." *Id.* 58-59.

Dr. Pepe noted that Mother has a guarded prognosis and poor judgment. *Id.* at 56; CYF Ex. 2, Psychological Evaluation Report, 8/19/21 & 8/25/21, at 11, 13. Dr. Pepe testified that it is "important to have somebody [that is] aware of those dynamics to work with the individual, and really needs to be involved with intensive treatment for a long period of time." N.T., 4/22/22, at 57. Dr. Pepe recommended that Mother complete an evaluation and enter an "intensive outpatient program," or, "at the very least, individual

psychotherapy on a weekly basis with a therapist that [has] experience with personality disorders." *Id.*

Mother, however, did not engage in the recommended level of treatment to address her mental health. Around the time of Dr. Pepe's August 2021 evaluation, Mother was participating in mental health treatment on a monthly basis through Mon Yough's dual diagnosis program. *Id.* at 59. Dr. Pepe did not believe that monthly treatment was sufficient for Mother and recommended a more intensive level of treatment. *Id.* at 59, 78-79. Dr. Pepe testified that Mother "had a lot of psychological issues" and that it was "very important that [Mother] address those issues in depth to maintain stability." *Id.* at 79. Although Mother testified that she subsequently increased her mental health treatment sessions from monthly to bi-weekly, there is no evidence that Mother participated in treatment at the level recommended by Dr. Pepe. *Id.* at 57, 97. Additionally, the CYF caseworker Ms. Guthrie testified that she asked Mother if she was currently in mental health treatment, but Mother did not provide her with a response. *Id.* at 24-25. The orphans' court properly determined that "Mother has not meaningfully engaged in mental health treatment" nor has she provided CYF with "documentation that she has been addressing this goal." Orphans' Court Opinion at 12.

In addition to Mother's mental health, the orphans' court noted that Mother "struggled with substance abuse issues for most of her life." *Id.* at

- 14 -

11. The court further noted "there is no indication that she has been living a clean and sober lifestyle." *Id.* The testimonial evidence supports the court's finding as follows. On direct examination, Mother testified: "I know I suffer from a drug addiction, like, and believe me, I wish everyday [sic] I didn't, you know." N.T., 4/22/22, at 101. Dr. Pepe testified that at the time of the August 2021 evaluation, Mother had been out in the community for only a couple of months, and given Mother's extensive substance use history, "it was vital that [Mother] continue drug screens and various treatment modalities." *Id.* at 62.

The record shows that Mother did not consistently engage in drug and alcohol treatment. Mother testified that after she was released from prison, she attended a dual diagnosis program at Mon Yough from April to October 2021. *Id.* at 93-95, 97. The orphans' court credited Mother's testimony that she graduated from Mon Yough's drug and alcohol treatment program in October 2021, and stated that "Mother should be commended for her successful completion of the Mon Yough program." Orphans' Court Opinion at 11; N.T., 4/22/22, at 94-95. The court, however, also noted Mother did not pursue any aftercare treatment after leaving Mon Yough. Orphans' Court Opinion at 11; N.T., 4/22/22, at 94-95. Mother testified that she re-engaged in drug and alcohol treatment only "a couple of weeks" prior to the April 22, 2022 hearing. N.T., 4/22/22, at 95. While Mother expressly acknowledges that she suffers from drug addiction, *Id.* at 101, there is no evidence in the

record showing that Mother engaged in drug and alcohol treatment between November 2021, through March 2022. *Id.* at 104.

Moreover, Mother had not complied with random drug screens between January and late March 2022. The orphans' court noted that Mother was largely compliant with random screens in 2021, but she only attended three out of fifteen random drug screens at the Health Department in 2022.[9] Orphans' Court Opinion at 11; N.T., 4/22/22, at 83. The record shows that after attending a screen on December 10, 2021, Mother did not appear for another screen until March 24, 2022. N.T., 4/22/22, at 85; CYF Ex. 3.

Mother asserts that she is currently on federal probation, and she meets with her federal probation officer and submits a urine screen once a month.[10] Mother's Brief at 23. However, there is no indication in the record that the screens for her probation are random. N.T., 4/22/22, at 92. Notably, Mother admitted that she did not appear for the random drug screens conducted at the Health Department. *Id.* at 104. Thus, Mother's lack of consistent engagement in drug and alcohol treatment and random drug screens further demonstrate her repeated and continued incapacity that caused Child to be

---

[9] The three screens that Mother attended in 2022 were on March 24, April 7, and April 13, 2022. N.T., 4/22/22, at 83-84. The results were negative. *Id.*

[10] As noted in Dr. Pepe's psychological evaluation report, Mother has a federal offense for Social Security fraud. CYF Ex. 2, Psychological Evaluation Report, 8/19/21 & 8/25/21, at 10.

without essential parental care, control, or subsistence necessary for her well-being.

Regarding the objective to address domestic violence concerns, the orphans' court noted that "[d]omestic violence was another important goal for Mother as she had been victimized by Father for several years." Orphans' Court Opinion at 12. Dr. Pepe testified that Mother was a victim of physical and sexual abuse perpetrated by Father, and Father admitted to being physically aggressive with Mother. N.T., 4/22/22, at 56. The abuse resulted in Mother's hospitalization and Father's seventeen-month incarceration. *Id.*

Mother asserts that she participated in the domestic violence treatment, is no longer in a relationship with Father, and intends to file for divorce. Mother's Brief at 23, 26. The orphans' court considered Mother's completion of domestic violence therapy at the Women's Center and Shelter, but noted that Mother continued her relationship with Father after his release from prison in October 2021. Orphans' Court Opinion at 12; N.T., 4/22/22, at 46, 48. The record shows that after Father's release from prison, Mother became more inconsistent with her visits with Child, and she stopped attending drug screens between January and March 2022. N.T., 4/22/22, at 27-28, 47, 85; CYF Ex. 3. Specifically, Mother missed approximately eleven visits with Child between January and April 2022. N.T., 4/22/22, at 28. Mother offered CYF various medical reasons for missing some of these visits. *Id.* at 28-29. However, when CYF requested Mother to sign releases, Mother declined. *Id.*

at 29. Mother then admitted to CYF caseworker Ms. Guthrie that she was not completing her court goals because "[F]ather was being very controlling and not letting [M]other leave the home." *Id.* at 30. While Mother testified that she ended her relationship with Father "weeks" before the April 2022 hearing and wants to get a divorce, Father informed CYF that he and Mother are still in a relationship. *Id.* 30, 103.

Mother's decision to resume a relationship with Father was concerning for CYF and Dr. Pepe. Ms. Guthrie testified that Mother and Father's continued relationship is "extremely concerning" due to their IPV or domestic violence history. *Id.* at 30. Dr. Pepe testified that if Mother were to reunify with Father, it "would really put the [C]hild in danger." *Id.* at 56. Dr. Pepe explained:

> [O]ne of the highest risk factors for child abuse is domestic violence. And, also, she was not exhibiting the care she would need for her own welfare and availability to her [C]hild, and so I have concerns about her judgment. And also, . . . , the history of multiple arrests and drug use so, . . . , I was concerned about her judgment.

*Id.* at 56-57. In light of Mother's continued relationship with Father even after completing domestic violence counseling, the orphans' court noted that "there is no evidence to suggest that [Mother] used any of the tools or resources available to her to leave an incredibly volatile relationship plagued by physical violence." Orphans' Court Opinion at 13.

The record amply supports the orphans' court decision to terminate Mother's parental rights under Section 2511(a)(2). As discussed above,

- 18 -

Mother's refusal to consistently participate with substance abuse treatment and random drug screens, her lack of engagement in the recommended level of mental health services, and her decision to resume a relationship with Father reflect a repeated and continued incapacity that caused Child to be without essential parental care, control, or subsistence necessary for her physical or mental well-being. Further, the conditions and causes of the incapacity cannot or will not be remedied by Mother. We conclude that the orphans' court was well within its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(2).

With respect to her second issue, Mother argues the orphans' court erred in proceeding to the Section 2511(b) analysis and concluding that termination would best meet the needs and welfare of Child. Mother's Brief at 29. Mother notes that she visited Child in her home and at the CYF office. *Id.* She relies on Dr. Pepe's testimony that, during the interactional evaluation, Child did not fuss when Mother changed Child's diaper, and that Mother responded to Child's needs and exhibited positive and appropriate parenting skills. *Id.* We disagree.

The orphans' court properly found that "[Child] did not have a necessary or beneficial bond with Mother." Orphans' Court Opinion at 15. Dr. Pepe, who conducted an interactional evaluation with Child and Mother in August 2021, testified that Mother "was, in general, consistently exhibiting positive and appropriate parenting skills," and "seemed to have a good understanding of

the [C]hild's development." N.T., 4/22/22, at 60. Dr. Pepe testified that although Child was familiar with Mother, Child did not have a primary attachment with Mother, and "she did not exhibit bonded behaviors toward her [M]other." *Id.* at 61. For example, Dr. Pepe observed that Child "was much more serious" with Mother and did not exhibit happiness. *Id.* at 60-61.

The orphans' court properly noted that Child is bonded with Foster Parents. Orphans' Court Opinion at 15. Dr. Pepe testified that Child is "exceptionally bonded" with Foster Parents, and "she would be at high risk for disruption of her current developmental functioning" if she were to be removed from Foster Parents. N.T., 4/22/22, at 67. Dr. Pepe testified if removed from Foster Parents, Child "could regress developmentally," and could develop childhood depression or an attachment disorder "if that primary bond is broken." *Id.* She further testified that Child "is in need of permanency" and is "very attached in her current home." *Id.* Dr. Pepe noted that Child's "current foster home would be a very positive permanent placement." *Id.* at 68. While Dr. Pepe testified that she observed Child become emotionally upset when Foster Parents tried to change Child's diapers, Dr. Pepe believed that Child was "doing it for attention with her [F]oster [P]arents." *Id.* at 61.

Additionally, CYF caseworker Ms. Guthrie testified that termination of parental rights would meet Child's needs and welfare. *Id.* at 34. Ms. Guthrie noted Child has been out of her parents' care since she was two months old.

*Id.* Ms. Guthrie testified that Child is doing well in Foster Parents' home, and she has all of her needs met. *Id.* She further testified that Child has a "genuine bond" with Foster Parents. *Id.* Ms. Guthrie stated that she observed "spontaneous affection" by Child to Foster Parents, and Child refers to Foster Parents as "mama" and "dada." *Id.* at 33. Ms. Guthrie also noted that terminating the parental rights would not be detrimental to Child due to her "strong bond" with Foster Parents and the length of time she has been in their home. *Id.* at 34-35.

As the orphans' court found, Child's needs are met by Foster Parents. Orphans' Court Opinion at 15. Ms. Guthrie testified that Child receives developmental and occupational therapy through Alliance for Infants. N.T., 4/22/22, at 32. Ms. Guthrie testified that Foster Parents have engaged Child in the appropriate programs, and Child receives services on a weekly basis. *Id.* at 33. She testified that Foster Parents provide for Child's emotional and developmental needs, and they provide her with safety and stability. *Id.*; *see In re A.S.*, 11 A.3d at 483. Ms. Guthrie also testified that Mother cannot provide for Child's safety and stability due to Mother's "own drug and alcohol needs and concerns with IPV." N.T., 4/22/22, at 34.

Thus, the orphans' court properly determined that termination of Mother's parental rights best suits the needs and welfare of Child. Orphans' Court Opinion at 14-16. We discern no error or abuse of discretion with the court's decision to terminate Mother's parental rights under Section 2511(b).

Based on our review of the record, we discern no error or abuse of discretion by the court in terminating Mother's parental rights under 23 Pa.C.S.A. § 2511(a)(2) and (b). Accordingly, we affirm.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2022